HERBERT S. JOHNSON *vs.* DELPHINE MAY GILLETTE JENKS & another.

Suffolk.    March 23, 24, 1925. — May 27, 1925.

Present: RUGG, C.J., CROSBY, CARROLL, PIERCE, & SANDERSON, JJ.

*Will*, Validity.   *Unsound Mind.   Evidence*, Presumptions and burden of proof.

An alleged testator in April, 1912, at the age of seventy-four years, made what purported to be his will, and died in 1924.   At the trial in the Superior Court of an issue framed on a petition for proof of the will, whether at the time of the execution of the alleged will the alleged testator was of sound mind, the trial judge admitted evidence concerning the life of the alleged testator from the time he was two years of age to the time of his death.   The evidence tended to show mental and physical weakness and peculiarities at the time to which it related. The only evidence which related to his condition during a period from a year before to a year after the date of the alleged will was testimony tending to show that at his boarding house he kept much to his room, muttered and talked to himself, offered hard boiled eggs which he kept on hand as "treats for the ladies," at one time forcibly sought to embrace his landlady, and at a time fourteen months after the will was made wrote directions to his then landlady to notify the attorney who drew it of his death.   There also was evidence that four years previous to the date of the alleged will he had made a will in which the respondents were beneficiaries, and witnesses for the respondents testified to

his soundness of mind at that time. The trial judge refused to order the jury to answer the issue affirmatively, and the petitioner alleged exceptions. *Held*, that

(1) There was no substantial testimony that the testator had not full capacity to understand the extent of the property of which he was disposing, nor to appreciate just claims of the contestants, when, in April, 1912, he executed the instrument offered for probate or at any time during the year 1912;

(2) A motion of the petitioner for an affirmative answer to the issue should have been granted.

At the trial of an issue framed on a petition for the proof of an alleged will made in 1912 by one then seventy-four years of age, whether the instrument, which purported to revoke a will made in 1908 in favor of the alleged testator's next of kin and which gave the bulk of his property to religious, charitable and benevolent institutions, was procured to be made through undue influence of the person named therein as executor, there was evidence tending to show that the petitioner, who was named executor, was pastor of a church which the alleged testator frequently attended; that the alleged testator consulted him as to the will, told him that he intended to revoke his previous will because his relatives had plenty of means, and asked and received advice as to the religious, charitable and benevolent institutions in which the petitioner was interested; and that, when asked for the name of an attorney, the petitioner recommended his "personal attorney," to whom the alleged testator went and who drew the will. The husband of the respondent testified as to a conversation with the petitioner just before the death of the alleged testator, and stated that the petitioner said to him that he was aware of the fact that the alleged testator was a "very difficult proposition" and that "he knew how to handle him." The judge ordered the jury to answer the issue in the negative. *Held*, that the ordering of the finding was right.

PETITION, filed in the Probate Court for the county of Suffolk on September 3, 1924, for proof of the will of Louis H. Perley, late of Boston.

The issues framed in the Probate Court, described in the opinion, were tried in the Superior Court before *Fosdick*, J.

With relation to the first issue, besides the evidence described in the opinion, there was testimony by Walter N. Chase by deposition that Louis H. Perley in the fall of 1911 and the early summer of 1912 roomed in the house of the witness's aunt, Clara E. Chase, at 134 Chandler Street in Boston, and that he saw him every day; that soon after Perley came there he very indignantly called him (Chase) up to his room and complained that someone had emptied the salt water which he had left in the bath tub so that he

could take frequent baths during the night; that there was only one such occasion; that Perley kept quite a stock of hard boiled eggs in the drawers in his folding bed "which he used to offer around as treats for the ladies"; that Perley was in his room a great deal; that he always sat in a morris chair which he brought with him; that he read little, and did not have three books in his room; that on one occasion he heard Perley very distinctly through the furnace pipe laughing and talking to himself in his room and "using expressions which I thought were very funny . . . . He said, 'Lay still there, you dirty little Democrat,' and then would laugh"; that he would hear him talking to himself perhaps once a week when he (Chase) was going by his door. Clara E. Chase testified to an occasion during the same period when the alleged testator called her to his room and attempted forcibly to embrace her, and that every few days when passing his door she would hear him muttering to himself. One Annie B. Young testified that from the fall of 1912 until the last of June, 1913, the alleged testator was a lodger in her house at 19 Concord Square, Boston, "that she saw him every day, sometimes several times a day; that said Perley seemed quite childish at times and often made very childish remarks when playing cards; that he had the habit of mumbling to himself and laughing to himself, and laughed quite heartily to himself at times; that in the latter part of June, 1913, she received a letter from said Perley . . . asking her to notify Mr. Reddy [the attorney who drew the will] of his death."

With relation to the second issue, the petitioner, called by the respondent, testified in substance that he had known the alleged testator as an attendant at his church and had at one time been consulted by him with regard to the making of his will; "He said he had requested this interview with me in order to secure my suggestions, my advice, as to the making of his will, and he told me that he had relatives in Chicago, a nephew and niece, for whom he had made a previous will; but he stated that he wished to revoke that will, and intended to do so because his relatives had plenty of means and did not need the money. Said he felt some-

what dissatisfied with his past life, and he said that he wanted to make his will for philanthropy, and he had come to me to get my suggestions in the matter; and I mentioned three possible philanthropies in a general way." He further testified specifically relating to advice which he gave to the decedent as to some of the charities mentioned in the will and that, being asked to recommend an attorney, he recommended one who he stated was his "personal attorney." The attorney, called by the respondents, also testified. There did not appear in their testimony anything to show that undue influence was exerted upon the alleged testator.

In a letter to one of the respondents dated October 12, 1911, the alleged testator wrote:

"Now you ask me what my physical troubles are. I told you all at Lake Beulah that it is *weakness* which I have suffered all my life, caused by a fall when only two years old, which *shocked* my *nervous system*. I have had Doctor after Doctor — & the *best* but never received the slightest benefit. My trouble has never been acute pains but weakness — *lassitude*. Please *digest* the above carefully.

"After leaving N. Hampshire in July I went to Nova Scotia — Wolfville & Chester. There I found it *cool*, or I should have been dead by this time. I am now feeling at my best taking it quietly and comfortably in a good large room lounging during day time in a Morris chair. Part of the time I take excursions by trolley to the beautiful suburbs of Boston. This is a fine day & I contemplate one this P.M."

The husband of one of the respondents, testifying to an interview with the petitioner just before the death of the alleged testator, stated, "At that interview he said to me that he had known Mr. Perley for about twenty years, first became acquainted with him in his church, having noticed him there on Sunday evenings at services and had at various times discussed Mr. Perley's affairs with him without any personal interest; and I mentioned to him that Mr. Perley was a very difficult proposition. He said he was aware of that but that he knew how to handle him, and that he had looked after him."

Other material evidence is described in the opinion. At

the close of the evidence, the judge denied a motion by the petitioner that an affirmative answer to the first question be returned and allowed a motion by the petitioner that a negative answer to the second question be returned. The jury answered the first question negatively. Both parties alleged exceptions.

*J. D. Graham*, for the petitioner.

*L. Weyburn*, (*A. C. Blake* with him,) for the respondents.

PIERCE, J.   Louis H. Perley, when seventy-four years of age, on April 26, 1912, executed the instrument offered for probate; he died of hypostatic pneumonia, arterio-sclerosis and a fractured humerus, on September 1, 1924, at the age of eighty-five years. In his will Perley undertook to divide his estate between the Anti-Saloon League, if incorporated within two years after the probate of the instrument, and Berea College of Kentucky. His clothing and furniture were given to the pastor for the time being of the Warren Avenue Baptist Church of Boston, to be distributed among such poor people as he might select. Reverend Herbert S. Johnson, then pastor of the Warren Avenue church, was appointed executor.

The Probate Court for the County of Suffolk framed and sent to the Superior Court for trial the following issues:

"1. Was Louis H. Perley at the time of the execution of the said alleged will of sound mind?

"2. Was the execution of said alleged will of said Louis H. Perley procured by the fraud or undue influence of Herbert S. Johnson exercised upon the said Louis H. Perley?"

The probate of the alleged will was contested by Delphine M. G. Jenks and Edwin F. Gillette, niece and nephew respectively of the said Perley, as also his next of kin and heirs at law. The proponent rested at the close of the evidence offered by the contestants and moved the trial judge to direct the jury to answer the first question in the affirmative and the second question in the negative. The judge granted the motion as to the second question and the contestants duly excepted. The jury answered the first question and issue, "No." The case is before this court on the exceptions of the proponent to the refusal of the judge to direct the

requested verdict, and upon exceptions to the admission of evidence; and is also before this court on the exceptions of the contestants to the granting of the proponent's motion and to a ruling of the judge upon the admission of certain evidence on the issue of undue influence.

The proponent on the first issue had the burden of establishing by a fair preponderance of the evidence that the testator, when he executed the instrument, understood the nature of the act and its effects, and understood the extent of the property of which he was disposing; and that he was able to comprehend and appreciate the claims to which he ought to give effect, and his relations to those persons who ought to be in his mind when he undertook to dispose of his property at his death. *Whitney* v. *Twombly*, 136 Mass. 145. *Becker* v. *Becker*, 238 Mass. 362, 366. *Needham Trust Co.* v. *Cookson*, 251 Mass. 160. *Banks* v. *Goodfellow*, L. R. 5 Q. B. 549, 565. And the jury passing upon the credibility of the witnesses could give such weight to the evidence offered in support of and against the issue as to them seemed appropriate under the instructions of the court.

In this case, as in the large majority of cases, it could not be ruled as matter of law that the burden of proof was sustained, if there was evidence beyond a mere scintilla to support the contention that Louis H. Perley was of unsound mind when the will was executed. *Lockhart* v. *Ferguson*, 243 Mass. 226, 228, and cases cited. The evidentiary facts, covering more than eighty years of the testator's life, offered by the contestants in support of their position that Louis H. Perley was not of sound mind when he executed the will, and received by the court, in many instances against the objection of the proponents, are grouped in the brief of the contestants with references to the testimony contained in the record as follows: The testator was a man of advanced age. He recognized that he was abnormal and attributed his condition to a fall he was told he had suffered in childhood. He had delusions and suffered from lapses of memory; he had fainting spells, tired quickly, and was obliged to sleep a greater part of the time. He wanted science to have his body to ascertain the cause of his abnormal condition. He

was irascible, he muttered and laughed to himself when alone, and had suicidal tendencies. He bathed excessively.

An analysis of the evidence describing the mental and physical characteristics of the testator up to the date of the execution of the will, in 1912, discloses that he had a fall when two years old which shocked his nervous system, and affected his vitality to such a degree that he had need to sleep from two thirds to three fourths of his time; that at times in his life he had fainting spells and in 1863 was sick "nigh unto death" and delirious for four days; that in 1901 he had a loss of memory for a day or two which occasioned his making some ridiculous remarks; that in 1909 he did not recognize his nephew at a meeting in Boston, and miscalled his nephew's wife, when introduced to her; that in 1910 he did not remember that his niece had married a German count; that in 1911 or 1912 he was heard muttering in his room; that in 1910 he took frequent baths, wanted four towels a day, wanted special food, criticised that which was served, understood only simplest language, did not want postal cards sent him because he did not want people to know about his affairs, and once left the table because he did not like remarks that were made.

In 1908 he made a will in which the present contestants are the sole beneficiaries, and evidence was given by witnesses to that will that he was then of sound mind. After the execution of the will in 1912, there is evidence that he tired quickly during the remaining twelve years of his life; that in 1913 he became discouraged and intimated in a letter to his attorney that he was contemplating suicide; that in 1914 he stated that his memory was failing and his mind not clear; that he did not remember anything and was forgetful; that in 1916 he complained of being lifeless and sluggish and spoke of his need of rest; that in 1917 he was troubled with dizzy spells and was treated at the Salem hospital; that he had such spells between 1917 and his death. There was other evidence of similar character describing the condition of the testator after 1912.

It is to be observed that there is no substantial testimony that the testator, when in April, 1912, he executed the in-

strument offered for probate, or at any time during the year 1912, had not full capacity to understand the extent of the property of which he was disposing, nor to the effect that he did not appreciate the just claims of the contestants. Nor is there any evidence of peculiarities or of eccentricities during that year such as were manifested from time to time over a period of seventy years before 1912, and at infrequent intervals after 1912 until 1924. Indeed the uncontradicted testimony shows that Perley prepared and delivered a holographic letter for the use of the attorney who drafted the proposed will, wherein the size and character of the estate were described, as were the manner he wished to have it disposed of, the fact that he had made the earlier will of 1908, the names of the previous beneficiaries and an expression of his intention to revoke that will. Having regard to all the testimony and to all proper inferences to be drawn therefrom, there is nothing to warrant a finding that the testator was of unsound mind when he executed the will in 1912. It follows that the request of the proponent should have been given, and that his exceptions must be sustained.

On the second issue, of undue influence, the jury were directed rightly to answer "No," and the contestants' exceptions are overruled.

*So ordered.*